**JOSEPH W. DAVIS, INC., Plaintiff,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 542, Defendant.**

**Civil Action No. 07–04951.**

United States District Court, E.D. Pennsylvania.

Nov. 13, 2008.

Jacob M. Sitman, Obermayer Rebmann Maxwell & Hippel LLP, Philadelphia, PA, for Plaintiff.

Regina C. Hertzig, Robert F. Henninger, Cleary & Josem LLP, Philadelphia, PA, for Defendant.

**Memorandum and Order**

YOHN, District Judge.

Presently before the court is defendant International Union of Operating Engineers's ("IUOE") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Joseph W. Davis, Inc. ("JWD") filed this action for declaratory judgment, injunctive relief and damages to set aside a disputed agreement between JWD and IUOE. At issue is whether the court has Section 301 subject matter jurisdiction over JWD's claims, whether the court's jurisdiction is preempted by the National Labor Relations Board's ("NLRB") primary jurisdiction, and whether the collective bargaining agreement is enforceable in favor of defendant as a matter of law. For the reasons that follow, the court will deny IUOE's motion for summary judgment.

### I. Factual and Procedural Background[1]

JWD is a corporation engaged in the construction business. (Compl.¶ 3.) IUOE is an unincorporated labor union.[2] (Compl. ¶ 5; Answer ¶ 5.) On Thursday, July 26, 2007, IUOE employee and agent Mike Fehrle ("Fehrle") telephoned Andrew Davis ("Davis"), the President of JWD. (Compl. ¶ 12; Answer ¶ 12.) Fehrle

---

1. Except where otherwise noted, the account contained in this section is comprised of undisputed facts and JWD's factual allegations. For the present motion, the court views all facts and justifiable inferences in the light most favorable to JWD, the nonmoving party.

*Startzell v. City of Philadelphia, Pennsylvania,* 533 F.3d 183, 192 (3d Cir.2008).

2. The qualification of JWD as an "employer" and IUOE as a "labor union" under the Labor Management Relations Act is not at issue in this motion.

asked Davis to consider hiring union members for JWD's construction projects. Davis informed Fehrle that JWD was a non-union company, but Fehrle persisted. (Fehrle Dep. 196:14–16.)[3] During the conversation, Davis asserts that he and Fehrle agreed that JWD would hire two IUOE members to work on a project in Bucks County, Pennsylvania for two weeks. (Compl. ¶ 13; Answer ¶ 13.) Davis testified that he was willing to hire IUOE members "[t]o avoid harassment and picketing on the site." (Davis Dep. 72:10–11, June 11, 2008.) Davis claims that this agreement was the only agreement that the parties discussed. (*Id.* 57:16–21; Answer ¶ 13.) Many details of the agreement were not solidified—Fehrle acknowledged in his deposition that he and Davis never discussed insurance, drug testing, arbitration procedures, fringe benefits, welfare benefits, or holiday pay. (Fehrle Dep. 195:8–196:1.)

On Friday July 27, 2007, Fehrle telephoned JWD to finalize the agreement. Davis was away on business, so Fehrle left a message with Sharon Davis ("Sharon"), JWD's Secretary and Treasurer and, incidentally, Davis's mother.[4] (Sharon Dep. 18:7–12, June 11, 2008; Compl. ¶ 14; Answer ¶ 14.) Davis returned Fehrle's call, and the two men confirmed the terms of the deal discussed the previous day. (Davis Dep. 74:11–15.) Davis claims that this is the extent of the negotiations between himself and Fehrle (Compl.¶ 16); IUOE disputes this claim (Answer ¶ 16). After confirming that JWD would hire two union workers, Fehrle told Davis that IUOE needed paperwork signed before sending any of its members to the Bucks County job site. (Davis Dep. 74:11–75:4.) Davis balked at the request and initially refused to sign any paperwork. (*Id.*) After allegedly receiving assurances from Fehrle

that the paperwork only formalized their telephone conversations, Davis agreed to sign "some simple paperwork." (*Id.* 74:22–75:4.) Davis asserts that during the conversation he conveyed his preconditions for signing; Davis testified that he told Fehrle:

> [I will agree to sign] [a]s long as we [Davis and Fehrle] are agreeing that this is just simple paperwork, this is not a contract, you're [Fehrle] not going to be harassing us, you're not going to be following us to any other job sites, and this is nothing other than two men for two weeks on this site.

(*Id.*) Fehrle allegedly responded "Yes, that's it." (*Id.* 75:3–4.) Davis claims that Fehrle then described the documents to him over the phone. (Compl.¶¶ 17–18.)

On the same morning, JWD claims it received a fax from Fehrle consisting of a wage sheet and a signature page from a collective bargaining agreement. (Fehrle Dep. 196:7–8; Compl. ¶ 15 Ex. A.) The signature page's heading is typed in bold-face and reads: "Collective Bargaining Agreement Effective May 1, 2006 to April 30, 2010 (Five County and State of Delaware), Effective May 1, 2006 to April 30, 2008 (Twenty Nine County)." (Def.Mot.Summ. J. Ex. F) (capitalization omitted). The wage sheet and signature page were numbered 46 and 138 respectively. (*Id.* Ex. D, F; Compl. Ex. A.) After sending the fax, Fehrle contacted JWD to request that Davis sign and return the documents "as soon as possible" so that IUOE could dispatch its workers on the following Monday. (Fehrle Dep. 254:17–18.) In his deposition, Fehrle explained the reason for his urgency:

> I [Fehrle] explained to her [Sharon] that I need the cover sheet faxed back to me,

---

3. The parties have not submitted the date of Fehrle's deposition to the court.

4. The position of "Treasurer Secretary" is one position at JWD. (Davis Dep. 13:24.)

signed, before I can even dispatch my guys for Monday. And to have them there on time, get this thing to me as soon as possible so I can call the Union hall, get the guys—the two guys that Andy [Davis] needs and have them there for him.

(*Id.* 254:23–255:6.) Testimony concerning the extent of the conversation between Fehrle and Sharon is conflicting. Sharon testified that she spoke with Fehrle regarding the wage sheet and the potential impact the deal would have on JWD's unemployment claims. (Sharon Dep. 20:23–22:6.) She further testified that Fehrle played an active role in the discussion. Specifically, Sharon stated: "Once I started questioning the unemployment and once I started questioning the rates, his [Fehrle's] tone very strongly changed. He got much firmer, and he started saying that the union is protecting the American worker from the employers." (*Id.* 21:19–22:2). Fehrle's account differs, and he testified that he "briefly" discussed "the rates" with Sharon.[5] (Fehrle Dep. 196:4–6.)

After speaking with Fehrle, Sharon emailed and spoke with Davis regarding Fehrle's request. (Sharon Dep. 22:19–22, 25:18.) Sharon described the contents of the fax to Davis; Davis testified that Sharon said "one page looks like a standard agreement where we need to fill in our company information [and][t]he other page has rates on it or lots of numbers." (Davis Dep. 84:14–17.) Later in the day, Fehrle called JWD again regarding the status of the documents. (Sharon Dep. 20:8–9, 17.) Subsequently, Davis received another email from Sharon updating him on the situation. (*Id.* 22:19–22.) Davis believed Sharon's earlier description of the docu-

ments was consistent with Fehrle's representations (Davis Dep. 84:18–22, 87:10–15); therefore, Davis authorized her to sign and return the signature page of the contract (the "Agreement") (*Id.* 88:3). JWD alleges that based on the information available to Davis when he authorized Sharon to sign the agreement, Davis "thought the man [Fehrle] was being truthful." (*Id.* 87:16–17.) Davis did not read the language of the signature page prior to authorizing Sharon to sign and return it to IUOE. (Compl.¶ 22.) When asked about his capacity to receive emails while away from the office, Davis stated that he was capable of receiving emails, but in this instance he was incapable of receiving a comprehensible version of the faxed documents. (Davis Dep. 85:8–23.) Davis explained that the documents "would have had to come by PDF and they'd be unreadable."[6] (*Id.* 85:12–13.)

In early September, Fehrle visited a new JWD job site in Montgomery County, Pennsylvania and discovered non-union employees operating JWD's equipment. (*Id.* 88:15–18.) On September 4, 2007, Fehrle contacted Davis to inform him that JWD was bound by and in breach of the Agreement, which IUOE considered to be a collective bargaining agreement; Davis disagreed with IUOE's interpretation of the Agreement. (Compl. ¶ 30; Answer ¶ 30.) Two days later, JWD received a letter of grievance from IUOE's counsel, Louis Agre ("Agre"), informing JWD that it was in breach of the Agreement for using non-union operators. (Compl. ¶ 34; Answer ¶ 34.) A second letter from Agre, received by JWD on September 25, 2007, demanded and scheduled an arbitration pursuant to the terms of the Agreement. (Compl. ¶ 36; Answer ¶ 36.)

---

**5.** The parties, collectively, have presented the court with only five pages of Fehrle's 255–page deposition.

**6.** IUOE alleges that JWD received the entire Agreement, which is 138 pages long, at some point. (Def. Mot. Summ. J. 13; Answer ¶ 15.)

The dispute between IUOE and JWD escalated in November 2007. On November 19, 2007, JWD alleges that Fehrle visited a Bucks County job site and harassed non-union employees, telling the employees that they could not continue to work for JWD unless they were union members (Compl.¶ 38); IUOE admits that Fehrle was present at the JWD job site on November 19, 2007, but denies the allegation that Fehrle harassed JWD employees (Answer ¶ 38). Finally, on November 26, 2007, JWD filed the pending action seeking declaratory, injunctive, and monetary relief. JWD's complaint asserts four counts: (I) fraud/fraud in the execution of contract/fraud in factum; (II) fraud in the inducement; (III) unilateral mistake; and (IV) tortious interference. IUOE filed this motion for summary judgment on August 1, 2008, arguing that (1) the court lacks § 301 subject matter jurisdiction, (2) JWD's claims are preempted by the NLRB's primary jurisdiction, and (3) the Agreement is valid and enforceable in its favor as a matter of law.

## II. Standard of Review

■■■■ A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). "Facts that could al-

ter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 743 (3d Cir.1996) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir. 1995)). The nonmoving party must present concrete evidence supporting each essential element of its claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. In doing so, the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and may not rely merely on bare assertions, conclusory allegations, or suspicions, *see Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## III. Discussion

### A. Subject Matter Jurisdiction

■■■ In its motion, IUOE challenges the court's subject matter jurisdiction. " 'A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action ....' " *Frett–Smith v. Vanterpool,* 511 F.3d 396, 399 n. 3 (3d Cir.2008) (quoting *Kontrick v. Ryan,* 540 U.S. 443, 445, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004)); *see* Fed. R. Civ. Pro. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

The threshold issue, therefore, is whether the court has subject matter jurisdiction.

JWD asks the court to review the validity of the disputed Agreement, asserting that subject matter jurisdiction exists under Section 301(a) of the Labor Management Relations Act ("LMRA"), which provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction over the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Supreme Court has interpreted § 301 narrowly, holding that it embraces suits "filed *because a contract has been violated." Textron Lycoming Reciprocating Engine Div. v. UAW*, 523 U.S. 653, 657, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) (emphasis in original).[7] In *Textron*, a union sought to invalidate a collective bargaining agreement. *Id.* at 655, 118 S.Ct. 1626. The Court found that both parties were in total compliance with the terms of the contract; without an accusation of breach, § 301 was inapplicable and unavailable as a means of establishing jurisdiction. *Id.* at 658, 118 S.Ct. 1626.

■ Notwithstanding the narrow interpretation, dicta in *Textron* explained that federal courts have jurisdiction to review the validity or existence of a collective bargaining agreement in at least two situations:

> [I]f, in the course of deciding whether a plaintiff is entitled to relief for the defendant's alleged violation of a contract, the defendant interposes the affirmative defense that the contract was invalid, the court may, consistent with § 301(a), adjudicate that defense.... *Similarly, a declaratory judgment plaintiff accused of violating a collective-bargaining agreement may ask a court to declare the agreement invalid.*

*Id.* (citations omitted) (emphasis added). As JWD seeks declaratory relief, the second situation the *Textron* Court described is applicable.

■ Before a district court can exercise § 301 jurisdiction in a declaratory judgment suit, a plaintiff must show that it has been accused of violating the terms of a collective bargaining agreement. *See J.W. Peters, Inc. v. Bridge, Structural and Reinforcing Iron Workers, Local Union 1*, 398 F.3d 967, 973 (7th Cir.2005), *amended by*, 2005 WL 957272 (7th Cir. Mar.1, 2005); *Law Fabrication v. Local 15 of the Sheet Metal Workers Int'l Assoc. Bd. of Trustees*, 396 F.Supp.2d 1306, 1309 (M.D.Fla. 2005). In *J.W. Peters*, the Seventh Circuit found that the plaintiff had been accused of violating a collective bargaining agreement—the plaintiff was accused of breaching the agreement by attempting to terminate it without proper notice. 398 F.3d at 973. As a result, the Seventh Circuit held that the case was a suit "for violation of contracts" within the purview of § 301. *Id.* Applying this same analysis, the *Law Fabrication* court held that it did not have subject matter jurisdiction because the plaintiff failed to allege that either party was in breach of the agreement, rendering the situation indistinguishable from the facts in *Textron*. 396 F.Supp.2d at 1309. Despite reaching different conclusions, both courts focused on the same dispositive question: whether the plaintiff was

---

**7.** *Textron* resolved a circuit split over the scope of district court jurisdiction under § 301. *See Mack Trucks, Inc. v. Int'l Union,* *UAW*, 856 F.2d 579, 589 n. 10 (3d Cir.1988) (discussing circuit split over scope of district court's power under § 301).

accused of breaching a collective bargaining agreement. The plaintiff here does not allege that IUOE is in breach of contract; thus, the propriety of the court's jurisdiction hinges on whether IUOE has accused JWD of breaching the agreement.

■ The parties acknowledge that JWD was informed repeatedly that it was bound by and in breach of the collective bargaining agreement—(1) on September 4, 2007, JWD was informed of its breach by telephone (Compl. ¶ 30; Answer ¶ 30); (2) on September 6, 2007, JWD received a formal letter of grievance (Compl. ¶ 34; Answer ¶ 34); and (3) on September 25, 2007, IUOE's counsel sent JWD a letter that demanded and scheduled an arbitration (Compl. ¶ 36; Answer ¶ 36).[8] Based on these facts, it is clear that IUOE has accused JWD of breaching the Agreement. Therefore, the court has subject matter jurisdiction under § 301, as its "power to adjudicate the contract's validity is ancillary to, and not independent of" the court's power under § 301(a). *Textron,* 523 U.S. at 658, 118 S.Ct. 1626. The court will deny

IUOE's motion for summary judgment with respect to subject matter jurisdiction.

## B. *Garmon* Preemption[9]

■ IUOE also argues that the court's jurisdiction is preempted by the NLRB's primary jurisdiction over labor disputes.[10] *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Under *Garmon,* when a matter is arguably subject to § 7 or § 8 of the National Labor Relations Act ("NLRA"),[11] state and federal courts must defer to the NLRB's primary jurisdiction. *Id.* at 244, 79 S.Ct. 773. This preemption does not apply, however, where the regulated activity is "merely peripheral" to federal labor law or "where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon,* 359 U.S. at 243–44, 79 S.Ct. 773; *see Pennsylvania Nurses Ass'n*

---

8. The accusations in this case are similar to those found sufficient to establish § 301 jurisdiction in *J.W. Peters.* In that case, after the plaintiff attempted to repudiate the contract, the defendant union filed a grievance and requested an arbitration. *J.W. Peters,* 398 F.3d at 970. The union also requested that a hearing be scheduled to determine whether the plaintiff had the power to repudiate the contract. *Id.* The Seventh Circuit found that the union had accused the plaintiff of breaching the contract and exercised jurisdiction accordingly. *Id.*

9. As discussed in Section C of this Memorandum, *infra,* § 301(a) calls for the application of federal common law. *See Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Mack Trucks,* 856 F.2d at 591. Both parties, however, rely on state law in their briefs and both refer to "state claims" that JWD's complaint raises. Therefore, the court construes JWD's complaint as (1) challenging the validity of

the contract under federal common law and (2) presenting four pendent state law claims. *See generally LaBuhn v. Bulkmatic Transport Co.,* 865 F.2d 119, 120 (7th Cir.1988) ("Anyone who brings [a § 301] suit is invoking federal common law whether he knows it or not . . . ."). Although JWD's complaint relies solely on § 301 for jurisdiction, based on the record before the court the pendent state claims arise from the same transactions and occurrences that support jurisdiction under § 301. 28 U.S.C. § 1367(a).

10. *Garmon* preemption "reflects the congressional intent that matters of national labor policy be decided in the first instance by the NLRB." *Mack Trucks,* 856 F.2d at 584 (citing *Garmon,* 359 U.S. at 244–45, 79 S.Ct. 773).

11. Section 7 details the organizational and collective bargaining rights of employees. 29 U.S.C. § 157. Section 8 defines and prohibits unfair labor practices on the part of employers and labor organizations. *Id.* § 158.

*v. Pennsylvania State Educ. Ass'n,* 90 F.3d 797, 803 (3d Cir.1996).

Here, IUOE argues that alleged misrepresentations made during negotiations between Davis and Fehrle implicate the § 8 duty to bargain in good faith. Additionally, IUOE asserts that Fehrle's alleged conversations with JWD employees and contractors at JWD's job sites constitute either activity that is arguably protected by § 7 or an unfair labor practice prohibited by § 8. The issue before the court, therefore, is whether Fehrle's actions trigger *Garmon* preemption. Resolving this issue requires an examination of (1) the relationship between the jurisdictional grant in § 301(a) and the NLRB's primary jurisdiction, (2) *Garmon's* effect on JWD's pendent state tort claims, and (3) the impact of IUOE's purported representational rights on the court's jurisdiction.

### 1. Section 301 and *Garmon*

The *Garmon* preemption doctrine "has never been rigidly applied to cases where it could not fairly be inferred that Congress intended exclusive jurisdiction to lie with the NLRB." *Vaca v. Sipes,* 386 U.S. 171, 179, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Relevant to this case, Congress explicitly crafted § 301 as an exception to the NLRB's primary jurisdiction. When applicable, § 301 does not defeat NLRB jurisdiction; rather, § 301 provides for concurrent jurisdiction between federal district courts and the NLRB. *See Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976) (citing *Smith v. Evening News Ass'n,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962)). In *Smith,* the Court reasoned that "[t]he authority of the [NLRB] to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301." *Smith,* 371 U.S. at 197, 83 S.Ct.

267; *see also Mack Trucks, Inc. v. Int'l Union, UAW,* 856 F.2d 579, 585 (3d Cir. 1988) (discussing relationship between *Garmon* and § 301(a) jurisdiction). Accordingly, "a district court retains independent jurisdiction to decide a case properly brought under § 301, even if the claim may also constitute an unfair labor practice under the NLRA." *Mack Trucks,* 856 F.2d at 585; *see Adkins v. Mireles,* 526 F.3d 531, 539 (9th Cir.2008) ("Some causes of action have been found cognizable in court despite technically implicating NLRA § 7 or § 8, including actions under LMRA § 301[.]").

As discussed above, this case is properly before the court under § 301. Therefore, *Garmon* is inapplicable. Importantly, *Textron* does not disrupt this conclusion; rather, *Textron* narrows the jurisdictional grant created in § 301(a). *See Trustees of the Twin City Fringe Benefit Funds v. Superior Waterproofing, Inc.,* 450 F.3d 324, 330 (8th Cir.2006). No language in *Textron* limits a district court's power once jurisdiction is established. The *Textron* court itself reasoned that § 301 merely "erects a gateway through which parties may pass into federal court; once they have entered, it does not restrict the legal landscape they may traverse." 523 U.S. at 658, 118 S.Ct. 1626; *see also Superior Waterproofing,* 450 F.3d at 330 ("[O]nce any party to an action asserts a contractual violation there is broad subject matter jurisdiction under § 301 to adjudicate related issues of contract validity such as fraud."). Because this case fits within § 301's narrow entrance, the court has the power to review the validity of the contract, including issues of fraud and mistake.

### 2. Pendent State Claims

The court finds that several issues of material fact surround the characterization and enforceability of the Agreement be-

tween JWD and IUOE. Thus, the court must deny defendant's motion for summary judgment with respect to JWD's state law claims.

■■■ As mentioned above, IUOE's *Garmon* argument centers on the duty to bargain in good faith when negotiating the terms of a collective bargaining agreement. *See Alongi v. Ford Motor Co.*, 386 F.3d 716, 723 (6th Cir.2004) (citing 29 U.S.C. § 158(d)). Central to IUOE's argument is determining whether the parties were under the § 8 duty to bargain in good faith when negotiating the Agreement. Generally, to trigger this duty, an employer and a union must have the authority to bargain. *Limbach Co. v. Sheet Metal Workers Int'l Ass'n*, 949 F.2d 1241, 1248 (3d Cir.1991). A union gains this authority when it is "designated or selected for the purposes of collective bargaining by the *majority* of the employees in a unit appropriate for such purposes." *Nova Plumbing, Inc. v. N.L.R.B.*, 330 F.3d 531, 533 (D.C.Cir.2003) (quoting 29 U.S.C. § 159(a)) (emphasis added); *see Limbach*, 949 F.2d at 1248.

■■■ Section 8(f) provides an exception to the majority requirement.[12] Under § 8(f), employers in the construction industry are permitted to enter into "prehire" agreements regardless of whether the majority of employees authorized a union to represent them. *See Limbach*, 949 F.2d at 1248–49. "Prehire agreements are collective bargaining agreements pro-

viding for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees." *Bldg. & Constr. Trades Council v. Associated Builders & Contractors ("Boston Harbor")*, 507 U.S. 218, 230, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993); *see also Limbach*, 949 F.2d at 1248 ("A pre-hire agreement is a contract between an employer and a union before the workers to be covered by the contract have been hired."). If the agreement at issue is a pre-hire agreement, it is considered a collective bargaining agreement. *Boston Harbor*, 507 U.S. at 230, 113 S.Ct. 1190 ("Prehire agreements are collective-bargaining agreements . . . ."). To determine whether an agreement qualifies as a pre-hire agreement under § 8(f), the court looks at whether three elements are met: "(1) [the agreement] must cover employees who are engaged in the building and construction industry; (2) the agreement must be with a labor organization of which building and construction employees are members; and (3) the agreement must be with an employer engaged primarily in the building and construction industry." *Operating Eng'rs Pension Trust v. Beck Eng'r. & Surveying Co.*, 746 F.2d 557, 562 (9th Cir.1984); *see Clark v. Ryan*, 818 F.2d 1102, 1107 (4th Cir.1987).

■■■ IUOE argues that the agreement between itself and JWD was, at the least, a pre-hire agreement. JWD denies entering an agreement that triggers *Garmon*.[13]

---

12. Section 8(f) provides:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority sta-

tus of such labor organization has not been established[.]
29 U.S.C. § 158(f).

13. JWD relies heavily on *Northwestern Ohio Admins., Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018 (6th Cir.2001) and *Operating Eng'rs Pension Trust v. Wilson*, 915 F.2d 535 (9th Cir. 1990), to support its claim that no duty to bargain is at issue in this case. The facts in *Walcher* are very similar to this case. Like JWD, Walcher & Fox ("WF") was a non-union employer; a union approached WF and

Instead, JWD argues that IUOE did not represent a majority of its workers and therefore lacked the power to bargain. (Pl.'s Br. in Opp'n of Def.'s Mot. Summ. J. 16.) This argument pinpoints the general rule, but overlooks the § 8(f) exception. JWD admits that Davis and Fehrle negotiated and agreed that JWD would hire two IUOE members for two weeks. (Compl.¶ 13.) This was an agreement between an employer (JWD) and a union (IUOE) that was entered prior to the employment of two union members who would be covered by the agreement. In addition, the signature page reads "Collective Bargaining Agreement," language that serves as evidence that a collective bargaining relationship was envisioned, at least as to the two employees.

Nevertheless, the record is ripe with questions of fact regarding the nature of the Agreement between IUOE and JWD.[14] First, during his deposition, Davis stated that he never intended to enter into an agreement that created any form of collective bargaining relationship with IUOE. Davis testified that it was "never ... represented [to him] that [JWD was] dealing with the union organization. It was only a man ... trying to find some work for his men .... Never was it referenced or represented that there was any interest in our company becoming union." (Davis Dep. 76:11–16.) Fehrle's testimony provides JWD with additional evidence on this point. Fehrle testified that he and Davis did not discuss specific and important issues that are germane to pre-hire and collective bargaining agreements generally. See, e.g., J.W. Peters, 398 F.3d at 969 (noting that pre-hire agreement at issue established "rates of pay, wages, hours of employment, fringe benefit contributions and other terms and conditions of employment"). Fehrle admitted that he and Davis never discussed fringe benefits, holidays, insurance coverage and drug testing. (Fehrle Dep. 195:8–196:1.) This evidence assists JWD in arguing that it did not intend to enter a collective bargaining agreement. Thus, the evidence raises genuine questions of fact surrounding the true nature and content of the negotiations between Davis and Fehrle.

The text of the Agreement does not resolve these issues. JWD, through both

suggested that WF hire two or three union employees. *Walcher*, 270 F.3d at 1022. WF agreed to hire a handful of union workers for various positions. *Id.* Each of the signed agreements incorporated the terms of a full-length collective bargaining agreement. *Id.* WF asserted that the agreement was intended to cover the union members only, not the previously employed non-union workers. *Id.* As in this case, WF brought suit in federal court arguing that it had been fraudulently induced into signing the collective bargaining agreement. *Id.* at 1022. The court held that *Garmon* preemption did not bar the state claims at issue. *Id.* at 1031. But, despite nearly identical facts, the Sixth Circuit did not discuss whether it was reviewing a pre-hire agreement. Rather, the court referred to the agreements as "project agreements." *Id.* Thus, the case is illustrative but not dispositive.

14. IUOE relies on JWD admitting that it entered into a "project site" agreement rather than a collective bargaining agreement. (Compl.¶ 13.) IUOE asserts that "project site agreements" are covered by § 8(f), and therefore impose on JWD and IUOE with the duty to bargain in good faith. IUOE does not present and the court has not found case law that explicitly refers to "project site" agreements as § 8(f) agreements. Conversely, in *Walcher*, one of the few cases that uses the phrase "project agreement," the court found a "project site" agreement free from *Garmon'*s preemptive power. See *Walcher*, 270 F.3d at 1029–30 (finding that "Project Agreements" did not implicate collective bargaining and therefore did not justify *Garmon* preemption). The court does not hold that the agreement at issue in this case is not covered by § 8(f); instead, the court is simply unable to make a determination as to the nature of the agreement.

Davis's and Sharon's deposition testimony, contends that only two pages of the Agreement were faxed to JWD. Aside from vaguely acknowledging that eventually the entire document reached JWD, IUOE presents no evidence that would eliminate the question of fact regarding the content of the facsimile transmission on July 27, 2007. Thus, the court, for the purposes of this motion, is left to review the two pages that JWD asserts it received. One page states in boldface that the agreement was a "collective bargaining agreement," which is consistent with IUOE's assertion that the parties intended a collective bargaining relationship. However, the other page is a wage sheet, which is consistent with JWD's assertion that the Agreement was intended only to cover (i.e., pay union wages) two IUOE members for a short period of time. Rational triers of fact could reach reasonable, yet divergent, conclusions concerning the legal effect of the Agreement when presented with the two page fax and the testimony of the witnesses. Therefore, the Agreement itself does not resolve, but furthers the questions of fact concerning its intended scope.

Because several questions of fact surround the type of agreement that JWD and IUEO intended, the court cannot find that, as a matter of law, the Agreement is a pre-hire agreement. These questions of fact are material because without finding that a pre-hire agreement exists as a matter of law and without evidence of majority representation, the duty to bargain in good faith is not triggered. Absent this duty, the court can not conclude that the pendent claims arise from activity that is arguably protected or prohibited by the NLRA. Thus, the court's jurisdiction is not preempted by the NLRB.

### 3. "Primarily Representational"

██ In its brief, IUEO argues that even if jurisdiction is proper under § 301, the court should nonetheless defer to the expertise of the NLRB because the case raises issues that are "primarily representational" in nature. (Def.'s Mot. Summ J. 9–10.) Essentially, IUOE argues that despite the existence of subject matter jurisdiction over JWD's claims and the inapplicability of *Garmon*, certain cases involve areas of labor law over which the NLRB harbors unparalleled expertise. Some case law supports this premise. *See, e.g., Pace v. Honolulu Disposal Serv.*, 227 F.3d 1150, 1156–57 (9th Cir.2000). In *Pace,* the court reasoned that "[a]lthough § 301 confers concurrent jurisdiction upon the NLRB and federal courts, ... district courts 'must tread lightly' in areas of the NLRB's primary jurisdiction and 'must continue to defer when, on close examination, section 301 cases fall within the NLRB's primary jurisdiction." *Id.* (quoting *United Ass'n of Journeymen, Local 342 v. Valley Engineers,* 975 F.2d 611, 614 (9th Cir.1992)). To determine if deference to the NLRB is appropriate, a district court should ask " 'whether the major issues to be decided ... can be characterized as primarily representational or primarily contractual.' " *Id.* at 1157 (quoting *Valley Engineers,* 975 F.2d at 614).

██ IUOE argues that because the purported Agreement would establish representational rights over JWD's employees, any lawsuit that seeks to invalidate it necessarily and primarily involves IUOE's representational rights. The court disagrees. First, a strict application of IUOE's interpretation of the *Pace* court's reasoning would undermine Congress's grant of jurisdiction to district courts under § 301, effectively precluding district court jurisdiction over all cases involving the validity of collective bargaining agreements. Such an application is inapposite to *Textron*, which acknowledges a district court's jurisdictional power to review the validity of collective bargaining agree-

ments in certain circumstances. *Textron,* 523 U.S. at 658, 118 S.Ct. 1626. Second, the dominant issues the court must resolve center on common questions of contract law (i.e., whether IUOE's actions constitute fraud or justify the application of the unilateral mistake doctrine). This case is a typical contractual dispute with "representational overtones." *Pace,* 227 F.3d at 1157. Overtones alone will not cause the court to ignore the clear reach of § 301.

Thus, for the reasons discussed in the forgoing sections, the court's jurisdiction is not preempted by the NLRB's primary jurisdiction. The court will deny IUOE's motion for summary judgment with respect to NLRB preemption.

### C. Validity of the Agreement As a Matter of Law

 JWD asserts that IUOE fraudulently induced and executed the Agreement.[15] To determine whether the Agreement is valid, the court must apply federal law. *Mack Trucks,* 856 F.2d at 591 (citing *Lueck,* 471 U.S. at 211, 105 S.Ct. 1904, and *Lincoln Mills,* 353 U.S. at 451, 77 S.Ct. 912). Under federal law, fraud is defined as "(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation." *Pence v. United States,* 316 U.S. 332, 338, 62

S.Ct. 1080, 86 L.Ed. 1510 (1942); *see also Hart v. McLucas,* 535 F.2d 516, 519 (9th Cir.1976); *Gordon v. Impulse Mktg. Group, Inc.,* 375 F.Supp.2d 1040, 1048 (E.D.Wash.2005). IUOE presents two arguments in support of its motion, each asserting that the Agreement is enforceable and binding in its favor as a matter of law. The court finds that both arguments fail and that summary judgment on the issue of the Agreement's validity must be denied.

 IUOE first argues that because a contracting party is under a duty to read the terms of a contract prior to signing, Davis's failure to read the Agreement renders it binding in IUOE's favor as a matter of law. There is support for this contention in the law and in the record. Federal law places a duty on contracting parties to inform themselves of the nature and scope of an agreement prior to signing. *See Shelton v. Ritz Carlton Hotel Co.,* 550 F.Supp.2d 74, 80 (D.D.C.2008) ("[U]nder both D.C. and federal law one who signs a contract has a duty to read it and is obligated according to its terms."). It is undisputed that Davis did not read the two page fax prior to authorizing Sharon to sign the signature page. (Compl.¶ 22.) It is also undisputed that Sharon did not read the entire two pages before describing them to Davis.[16] (Sharon Dep. 26:8–27:2.)

---

**15.** JWD specifically raises four species of fraud: (1) fraud, (2) fraud in the execution, (3) fraud in the inducement, and (4) fraud in the factum. "[T]he distinction between fraud in the inducement and fraud in the execution is that 'the former induces a party to assent to something he otherwise would not have'; the latter induces a party to believe the nature of his act is something entirely different than it actually is." *Connors v. Fawn Mining Corp.,* 30 F.3d 483, 490 (3d Cir.1994) (citing *Southwest Adm'rs, Inc. v. Rozay's Transfer,* 791 F.2d 769, 774 (9th Cir.1986)). Fraud in the factum is " 'the sort of fraud that procures a party's signature to an instrument without

knowledge of its true nature or contents.' " *MBIA Ins. Corp. v. Royal Indem. Co.,* 426 F.3d 204, 217 (3d Cir.2005) (citing *Langley v. FDIC,* 484 U.S. 86, 93, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987)).

**16.** Sharon testified that she did not read the text of the signature page; she further testified that even had she read it, she would not have comprehended the language. (Sharon Dep. 26:8–27:2.) Based on her discussions with Fehrle and Davis regarding the wage sheet, the court infers that Sharon read portions of the wage sheet. (*Id.* 21:21–24, 23:12–17).

This rule, however, is neither absolute nor without exceptions. A party will not be bound if that party was the victim of fraud or overreaching. *Id.* ("A signature on a contract indicates a mutuality of assent to which a party is bound unless she can show some special circumstance such as fraud, duress, or mutual mistake."). Here, Davis asserts—and has presented evidence tending to show—that Fehrle misrepresented the content and effect of the Agreement. It was because of these misrepresentations, Davis testified, that he authorized Sharon to sign the documents on his behalf. (Davis Dep. 84:18–22, 87:10–15, 88:3). This evidence is sufficient to establish a genuine issue of material fact as to whether Davis's signature was procured by Fehrle's fraudulent representations.

IUOE's second argument concerns Sharon. IUOE argues that Sharon had the authority to contractually bind JWD and, because Fehrle made no false representations to Sharon, the contract is enforceable as a matter of law. This argument requires the court to conclude that: (1) Sharon possessed the authority to unilaterally bind JWD to contracts like the one at issue in this case and (2) Fehrle did not make any fraudulent misrepresentations to Sharon during his communication with her on July 27, 2008. Genuine issues of material fact exist as to each of these necessary conclusions.

First, a series of emails between Davis and Sharon raises questions concerning Sharon's authority at JWD. The emails were sent in the following sequence (all emails occurred on Friday, July 27, 2007):

1. 8:09 AM, Sharon Davis to Andrew Davis: "Call Mike Fehrle ... Should I talk to him re: payroll."

2. 8:11 AM, Andrew Davis to Sharon Davis: "Call him and discuss pay. I will call him within the hour to discuss needs."

3. 10:57 AM, Sharon Davis to Andrew Davis: "That Mike wants me to sign and fax back contract a.s.a.p. Should I? Says he needs it to set things up for Mon."

4. 11:12 AM, Andrew Davis to Sharon Davis: "Go ahead."

(Def.'s Mot. Summ. J. Ex. E.) A reasonable jury could conclude that in each of Sharon's emails, she was seeking the authority to act—first asking Davis whether she should call Fehrle and then asking whether he wanted her to sign the agreement. Buttressing this conclusion is the fact that Sharon signed Davis's name, not her own. (*Id.* Ex. F.) Based on these facts, a jury could find that Sharon lacked the authority to unilaterally bind JWD to the Agreement. Thus, the evidence unveils genuine issues of material fact regarding Sharon's authority at JWD.[17]

Second, even assuming that Sharon had such authority, Fehrle had several conversations with Sharon on Friday, July 27, 2007. Sharon testified that during these discussions Fehrle made numerous statements regarding the effect of the Agreement on JWD's business operations. In her deposition, Sharon stated that (1) Fehrle dismissed her concern about JWD's unemployment rates with a factual asser-

---

17. In its reply brief, IUOE presents one portion of Davis's deposition testimony to support its argument that Sharon had the authority to contractually bind JWD. (Def. Reply. Br. Ex. A; Davis Dep. 14:1–25). This testimony, however, does not establish that Sharon possessed such authority. Rather, Davis testified that Sharon handles the "bookkeeping" at JWD and occasionally "[c]leans the shop [and] bakes brownies." (Davis Dep. 14:9–12.) At no point does Davis testify concerning Sharon's authority to enter into contracts on behalf of JWD. Whether Sharon possessed such authority remains an open and genuine question of fact.

tion regarding IUOE union members' yearly salaries,[18] and (2) when she began to question Fehrle about the wage sheet, Fehrle "started in with [a] speech." (Sharon Dep. 21:19–20.) The court does not suggest Fehrle's statements were fraudulent, but whether such statements were fraudulent is yet another question of fact.

Therefore, viewing the record as the court must when evaluating a motion for summary judgment, the court finds that the case will hinge on factual determinations and credibility assessments, making summary judgment at this stage inappropriate.

## IV. Conclusion

In sum, the court finds that it has subject matter jurisdiction over this case under § 301 because IUOE has accused JWD of breaching the Agreement on several occasions. The court's jurisdiction is not preempted because Congress explicitly enacted § 301 as an exception to the NLRB's primary jurisdiction. Furthermore, the evidence before the court prompts genuine issues of material fact regarding the existence and validity of the Agreement that are ripe for jury review. Therefore, IUOE's motion for summary judgment must be denied. An appropriate order follows.

### Order

**AND NOW** this 13th day of November 2008, upon consideration of defendant IUOE's motion for summary judgment, plaintiff JWD's response thereto, and defendant IUOE's reply, **IT IS HEREBY ORDERED** that the motion is **DENIED.**

18. Sharon testified that when she raised her unemployment concerns, Fehrle responded by "citing the fact that [the IUOE workers] make

Trial is **SCHEDULED** for **JANUARY 12, 2009** at 10 a.m. in Courtroom 14B.

70, 70–some thousand a year, [so unemployment] wouldn't be a problem." (Sharon Dep. 21:8–9.)